CARAWAY, J.
hThe plaintiff was injured after a large pine tree fell across a roadway onto his car on a highway in Ruston, Louisiana. Plaintiff suffered a broken neck, bruises and contusions as the result of the accident. Suit was filed against the property owner where the tree was located and the State of Louisiana Department of Transportation and Development (“DOTD”). After a jury denied plaintiffs claims, he pursued this appeal. Finding no manifest error in the jury’s verdict, we affirm.

Facts

At approximately 8:24 p.m., on .the stormy evening of November 14, 2007, Larry Mitchell and a passenger traveled west ori U.S. Highway 80 (West California Avenue) in the City of Ruston (“City”), Louisiana, when a large pine tree, fell across the roadway onto the front of Mitchell’s vehicle, crushing the front windshield. The falling tree also caused a telephone pole to fall. Mitchell’s vehicle was in the outside lane at a point between Hull and Hodge Streets. The tree was estimated to be 70 feet tall and located 30 feet from the street curb.
At the accident location, Highway 80 is four-lane highway within the City limits. DOTD concedes its responsibility for the maintenance of the highway. Its right-of-way measures 40 feet from the middle of the road. The City’s right-of-way for its electrical line begins immediately on the north side of the highway. The City formally conducted inspections of its electrical line right-of-ways at least once every three years. The property on | awhich the tree was located was owned by Beverly Hill-Hercules, and was immediately to the north of the electrical right-of-way.
As the result of the accident, -Mitchell suffered three moderate to severe fractures in his cervical spine, a left medial maxillary wall fracture and a thoracic compression fracture. He also received bruises and contusions. At the time of trial, Mitchell wore a cervical collar-for stabilization of his neck although some (C7 and C2) of the fractures had-healed.. Minor anteri- or fusion of C6 and -C7 had occurred possibly as a result of his wearing the collar for 7 years. Mitchell also suffered from posterior ligamentous instability that produced pain in his neck. Doctors recommended that Mitchell undergo an anterior discectomy and fusion, which he declined because of associated risks. -
On November 10, 2008, Mitchell filed suit against Hercules, her insurer, Liberty Mutual Insurance Company (“Liberty Mutual”) and DOTD. Mitchell or Hercules later added as defendants, the City and Wolf Tree Experts, an independent contractor providing tree maintenance services to the City.[1]
A jury trial concluded on July 31, -2014, when the jury returned a verdict in favor of the defendants. Mitchell has appealed the jury verdict, raising two assignments of error. He argues that the trial court’s admission ofithe Herculeses’ depositions in lieu-of live testimony was a bieach of a pretrial agreement, denied him cross-examination'of the witnesses and resulted in unfair prejudice to Mitchell which requires reversal of the | ¡Judgment. Mitchell also *156 contends that the jury verdict was manifestly erroneous.

Discussion

There is an issue raised in this appeal by Mitchell concerning the trial court’s evi-dentiary ruling allowing the depositions of Hercules and her husband into evidence due to their unavailability for trial. Mitchell claims that their depositions were inadmissible and created confusion over the exact location of the tree in question months after it fell, casting doubt over whether Mitchell’s expert examined the stump and the remains of the tree. Nevertheless, since we find that much of the expert testimony on both sides considered the photographic evidence of the actual fallen tree and its roots immediately after it fell, we will first address Mitchell’s assignment of error that the jury’s verdict was manifestly erroneous and then address the trial court’s evidentiary ruling.
I.
Mitchell argues that the jury verdict is manifestly erroneous because the “overwhelming evidence documents that the tree fell because the roots on the north side of the tree tore loose from the ground,” and those roots were weakened by disease. Further, Mitchell argues that the evidence shows that the aboveground roots and rotted areas would have been evident to anyone looking at the base of the tree prior to its fall.
An appellate court may not set aside a jury’s findings of fact in absence of manifest error or unless it is clearly wrong. Lewis v. State, through Dept. of Transp. & Dev., 94-2370 (La.4/21/95), 654 So.2d 311; Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993). To reverse a fact finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra. If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. Where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Further, when findings are based on determinations regarding credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Id. Only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in that which is said. Scott v. State Farm Fire & Cas. Co., 47,490 (La.App.2d Cir.9/26/12), 106 So.3d 607.
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. La. C.C. art. 2317.1. The requirement of actual or constructive notice imposes upon the owner or custodian a duty to exercise reasonable care in discovering ruin, vice or defect. This is a duty to 1 ¿recognize that the thing creates an unreasonable risk of harm to another when applying the degree of attention, perception of the circumstances, memory, intelligence and judgment exercised by a reasonable person. Brown v. Williams, 36,863 (La. App.2d Cir.7/31/03), 850 So.2d 1116, writ denied, 03-2445 (La.11/21/03), 860 So.2d 555.
*157 An Act of God, or force majeure, is an unusual, sudden and unexpected manifestation of the forces of nature which man cannot resist. An injury caused by an Act of God is one which is due directly and exclusively to natural causes that could not have been prevented by the exercise of reasonable care. Brown, supra.
The state’s duty with respect to its roadways is to keep the road and its shoulders in a reasonably safe condition. The state is not the guarantor of the safety of motorists. Thompson v. State of Louisiana, 97-0293 (La.10/31/97), 701 So.2d 952.
The state’s duty is to inspect for dead trees and remove them within a reasonable time. The state is not required to inspect for all trees which could fall on the road and remove them simply because they have the potential to fall on the road. Thompson, supra. There is also no duty requiring DOTD inspectors to walk around all sides of a tree and check it for damage, particularly when the tree is otherwise green and healthy. Caskey v. Merrick Const. Co., 41,662 (La.App.2d Cir.1/24/07), 949 So.2d 560, writ denied, 12-0847 (La.6/1/12), 90 So.3d 442 citing Lewis, supra. The Louisiana Supreme Court has rejected a finding of liability against the state where a dead tree which fell onto a highway was not discovered by |fiDOTD due to the presence of other trees which obscured the view of the dead tree and the presence of bark on the lower portion of the trunk. Lewis, supra.
At trial, Tommy Lane Boddie was called on cross-examination by the plaintiff. Boddie had worked for DOTD for 32 years and, as superintendent of Lincoln Parish roads, inspected 327 miles of state roads in Lincoln Parish every two weeks. Boddie would observe trees along the roads to see if they were dead and examined trees both in the right-of-way and those adjacent to it that were tall enough to adversely affect traffic. Boddie did not check for disease in trees and would report a leaning tree only if it was “leaning pretty good.” No DOTD employee received instruction on spotting diseased trees.
Robert Holyfield testified on cross-examination by plaintiffs. He had replaced Boddie at DOTD a few months before the accident. He also rode the roads biweekly. Holyfield explained that a tree had to lean at least 45 degrees to cause him concern about the tree falling or a wind taking ' it down. Holyfield did not recall that any work orders had reported any problems with the trees in the one-block area where the accident occurred.
Holyfield viewed a November 14, 2007 work order from the day the tree fell. The document indicated “tree removal.” Holyfield could not remember any other trees that were removed between Hull and Hodge- Streets in the 3-4 year period before the tree fell.
Holyfield was shown Exhibit 97, a photograph from a film of the area taken by DOTD on June 27, 2007. The photograph showed West California Street, and Holy-field identified the left side of the street as possibly showing [7the tree in question. Holyfield testified that this tree was not a problem because it was “not really leaning that bad,” and it was not dead.
On direct examination, Holyfield identified Exhibit 90, road inspection forms from September 24, 2007 to November, 18, 2007. The documents showed that Holyfield had driven and inspected the road in question every two weeks during this- 'time frame and noted only potholes as possible problems. Holyfield reviewed photos, Exhibits 91-103 (photographs of the alleged tree in varying years), and testified that he saw nothing-in Exhibit 91 (2005), Exhibit 94 *158 (2005) or Exhibit 96 (2007) that would have caused him concern about the trees shown.
Karen Frost, Mitchell’s sister, testified that she went "to the scene of the accident. The next day, she went back and saw that the tree had been removed from the road, although there were remnants of.it near the road. She took pictures of the tree which she identified at trial. Exhibits 1-14 showed what the tree looked like after it was cut immediately following the accident, including .exposed roots at the bottom where the tree fell.
The deposition of Clame Moxley taken July 27, 2011, was read into evidence on behalf of the. plaintiff. At the time of the accident, Moxley served as the City forester and made sure that the power lines were protected from trees. Moxley had a forestry degree and a Louisiana arborist license. She was a certified arborist (tree surgeon) and had a utility specialist certification. When tree work was necessary along the power lines, the City would contract with private companies to perform the work.
IsMoxley was notified of the subject accident the morning after it happened and personally observed the tree after it was cut. She .saw that the tree had green pine needles, a solid trunk and running sap coming from where the tree had been cut. Moxley saw. remnants of the tree on the north and south sides of West California. She understood that the tree had come from the north side of Highway 80 and fallen into the road. Moxley reviewed photographs and testified that if the City took a tree- down, they would grind the stump. It was her responsibility to see that the stumps were ground. In this specific case, Moxley had no independent recollection of a stump being at the location the day after the accident.
On the day of her inspection, Moxley examined the trunk or stem- of the tree and did not see anything to indicate that it was diseased. Moxley indicated that when she made her drive-bys she looked for broken limbs, brown pine needles, sears on the trees, sloughing bark or anything that would éndanger thé power lines.
Moxley did not know what caused the tree to fall other than the strong wind from the storm. She stated that there were other trees that fell that night. The tree in question “just came up from the roots,” as the tree was uprooted. She did not investigate the roots of the tree, only the stem. She assumed the root system was deteriorated because the tree was not able to withstand the wind.
Edward Patterson, a forestry consultant and expert in forestry, testified as Mitchell’s expert. Patterson stated he was not an urban forester like Moxley. Nor was he an arborist, although both obtained the same Ldegree from Louisiana Tech. He explained that urban forestry works on a tree-by-tree basis and rural forestry deals with larger tracts. Patterson was consulted by plaintiff to investigate the tree that fell on November 14, 2007. He went to the location ten months after the incident and submitted a report on September 8, 2008. Patterson also took his own photographs of the location. He noticed stumps in the surrounding area and saw that the “stump in question” had no tap root and had dead roots on the north side of the stump. •
Patterson also saw Frost’s 14 photographs taken at the time of the incident and 9 other photos, Exhibits 19-27, taken while the tree was still on the ground where it fell. At trial, he observed from Exhibit 1 an indentation or bow in the trunk of the tree caused by an old ice storm or cronartium fusiforme. The shape of the tree at the bów indicated to Patterson that the tree was previously damaged *159 by some exterior force. «.Patterson estimated that the bow would have been less than 20 .feet from the base of the tree.
Patterson testified about an unidentified photograph of the stump- he saw when he made his first visit. He stated that the longest root still had a few root hairs but there was no tap root visible at' all. According to Patterson, the stump “just flopped” back over in . the stump hole. Patterson explained that this occurred because the roots on the north side were no support for the tree and there was no tap root. Patterson surmised that the dead roots were visible aboveground, before the tree fell. When Patterson arrived, the stump was “flopped over in the hole” and he pulled it back out |inand flopped it back down before he left. . The street side roots were still holding. ...
Patterson saw three smaller .stumps adjacent to the stump in question that had been out there several years. The trees appeared to have been dead when cut because of deterioration of the stumps'. Some were decayed more than others. ’
Patterson looked at Exhibit 5, depicting the stump of the. tree immediately after the accident. The photograph showed the trunk still attached to the tree. According to Patterson, Exhibit 5 showed the dead root and other roots that should have had more root hairs on them with dirt attached to them. The lack of dirt and root hairs indicated to Patterson that the "root was aboveground.
Patterson further explained that the pine needles were not going to “tell you a lot on this tree” because the structure of the tree and the roots were the indicators of the health of the tree. A tree with deteriorated roots on one side can maintain green needles in the top canopy of the tree. In order of priority, Patterson looked at the roots first, the trunk next and the needles last.
Patterson discussed photos, Exhibits 19-25, taken immediately after the accident with the stump'bent over on the ground and, the trunk still in place. Specifically, he testified .that Exhibit 21 showed the lack • of a tap root. . The photograph showed the whole length of a root perpendicular to the trunk that Patterson opined was aboveground before the tree fell.
InPatterson could tell nothing from Exhibits 91 and 92, photographs of the video of the area taken by DOTD in 2005. In Exhibit 94, Patterson was able to pick out the tree in question along with three other trees. From Exhibit 96⅛ video taken six months-before the accident, "Patterson noted that one of the four trees was missing.
Patterson identified Exhibits 28-31, which were photographs he took on his initial visit to the site in September of 2008. The photographs showed a total of three stumps, including the one in question. On the subject stump, Patterson testified that the fact that you could flip the stump up and down showed that the tap foot was broken or nonexistent;' He agreed that the roots shown on the photographs taken immediately aftér the accident showed roots that were not there on his September 2008 visit. Exhibits 32-35 also showed photographs of the stump taken by Patterson. He testified that by this time “most of the stump had deteriorated,” and that “there had b'een a lot of activity around it.” '
intimately Patterson concluded:
The tree was obviously sick, mostly from root problems and the structure of the trunk," and as far as what could be seen from — you ■ know, from the street if they’re looking for dead needles, this tree wouldn’t have any.
He stated that visible signs of this condition were seen “in .the roots,primarily and in the trunk, number two.” He saw a bow *160 or crook in the tree and characterized the tree as having the potential to be a hazardous tree adjacent to a roadway. •
■ On cross-examination, Patterson testified that his focus was on the remaining stump of the tree and that he did not investigate any other trees [^around the City that fell on November 14, 2007. Patterson was unaware that the City and DOTD dispatched crews to deal with other downed trees on the night in question. He conceded that a • straight-line wind can knock down a perfectly healthy tree and admitted that without a straight-line wind, this tree may have stood for 20 years or more even with disease. Patterson agreed that he did not see any missing bark or hollows on the tree, although he detected what he considered to be a canker on the tree. He agreed that there were no áreas of missing bark, rotted out sections of the tree or decay evident' from the photographs.
Patterson testified about what he saw on the roots of what remained at the location in 2008. Patterson testified, that the roots which he thought were aboveground could have been nicked by a lawnmower or mechanical piece of equipment. Patterson agreed that his observation of the curvature of the tree would not be significant to a lay, person and conceded that the tree did not fall because of the curvature in the trunk. He testified that the only.thing visible to a lay person would have been the aboveground roots. He stated, as possibly being true, that aboveground roots are more common in urban pine trees. Patterson testified that he saw no evidence of disease in the two remaining live ’trees located near the one that fell.[2]
Dr. William Ross, a defense expert in forestry, was called on cross-examination by the plaintiff. He testified that he was hired six years after the tree' fell to review Patterson’s opinion. Ross had no idea why the tree [ 1Rfell because it was “way too long after the fact.” He testified that his review of the photographs of the actual fallen tree and stump led him to a different conclusion from Patterson. Ross was unable to say that there was anything wrong with the tree from looking at the photographs. He agreed that the place to start with a fallen tree is the roots. Ross testified that if he had been able to- examine the tree after it fell, he could have made a more definitive study of why it fell or if there was a problem with the roots. From the photos, Ross concluded that he saw no evidence of disease in the tree and concluded the same regarding the roots.
DOTD presented the testimony of Darrell Caraway, utility manager for the City. Caraway described the storm that came through that night as “major,” and stated that several thousand customers lost electricity due to trees being down in the area. He went to the scene of the fallen tree in question. By the time he got there he had already checked out three other locations where healthy trees were down. According to Caraway, “it was a fairly major storm that came through cause we had quite a bit of damage due to high winds.” The tree in question was not located in the City’s right-of-way for the electrical line.
Caraway confirmed that standard procedure for the City is to grind stumps. He explained that contractors perform the work in batches so they may get ground a *161 year later because the work is not done until there is a group of stumps to grind.
From our review of this testimony, we find that the jury’s verdict rests and may be affirmed on multiple grounds. First, Patterson’s opinion of a | udiseased or damaged root system was somewhat scientifically underwhelming. His testimony did not'pinpoint an unquestionable disease, as it centered on one root extending outward from the base of the tree along or near the surface of the ground. His testimony about the tap root, or lack thereof, was not fully explained. We recognize that Patterson’s review may have been hampered by the ten months which elapsed after the accident before his onsite inspection. However, the photo of the tree stump on the morning after the accident which he reviewed was the best evidence of the stump and roots and was also the evidence which the City’s forester actually witnessed. She testified that the upturned roots at the stump did not give her any indication of root disease.
Second, even assuming Patterson’s theory of diseased roots, the jury could conclude that neither the DOTD nor Mrs. Hercules should have known of the problem. The tree was green and healthy from the ground up and was not leaning. The DOTD cannot be expected to make root inspections of healthy trees on the property of third-party owners along its right-of-ways and to understand the subtleties of the damaged root hypotheses of Patterson and seek from the owner the tree’s removal. Likewise, Patterson’s speculation that an aboveground root was present in this instance and possibly visibly damaged does not give clear notice to Hercules that the otherwise healthy tree was at great risk of falling. Of course, any problem with the tree’s tap root was underground and unknown before the tree fell.
11KFinally, the evidence of the intensity of the windstorm was also a significant Act of God defense upon which the jury’s verdict could rest.
Accordingly, under our manifest error rule, we affirm the jury’s verdict.
II.
At trial, over plaintiffs objection, the defense presented Beverly Hill-Hercules’ testimony from a March 15, 2010, deposition in which plaintiff was allowed to question the witness. Likewise, portions of Jocelyn Cuthbert Hercules’ deposition of April 23, 2010, was also read into evidence.
These witnesses confirmed living on the subject property on the night the tree fell. They had gone to the store together and returned home after the tree had fallen. Mrs. Hercules recalled that the weather was “very windy” that night and that the wind was “stronger than usual.” Neither Hercules noticed any problems with the tree before it féll and did not know who removed the fallen tree. The couple confirmed that the tree was cut that night but removed at a later time.
The Herculeses had trouble identifying the tree in question from the photographs taken of it after it fell. Each recalled, however, that the tree was completely uprooted and fell across the road away from their home. The controversial portions of the depositions concern the couple’s recollection of whether a stump remained on their property after the tree’s trunk portion was removed. Mrs. Hercules stated that Patterson’s photographs and others depicted as the “stump in question” (Exhibits 28-j35),16 were not the tree that fell that night because “the tree that fell was uprooted, and it was just a hole in the ground.” Mrs. Hercules denied that a stump was left in place or that it could “bounce back in place.” When asked if *162 that was possible, ■ she said, “I know it wasn’t.” Mr. Hercules testified that whoever moved the tree, “took the whole thing,” leaving only a hole in the ground. He testified that no stump remained.
Immediately prior to trial, Mitchell filed a motion to exclude the Hereuleses’ deposition testimony. Hercules and her husband had moved from the subject property to Durham, North Carolina, and were going to be on vacation in Texas during the week of trial. Counsel for the Hereuleses opposed the motion, arguing that the basis for admission óf the deposition at trial, was the Hereuleses’ unavailability due to their location more than 100 miles from the place of trial and residence out of state.
On July 28, 2014, counsel orally argued the motion before the trial began. Counsel for Mitchell argued that in a July 3, 2014 pretrial conference, it was agreed that the couple would testify at trial via Skype on the internet by live video-audio feed. However, at the final status conference, the week before trial, counsel for the defendants informed the court that the couple would not be “able, to be Skyped” because the motels in which they were staying did not have the required capabilities. The witness then indicated that because of this situation, the depositions of the Hereuleses taken in March 2010, would be offered into evidence. Mitchell strongly opposed the suggestion arguing that the testimony was stale and not subject to cross-examination.
h7The trial court ruled that- the depositions werp admissible because the defendant and her husband were unavailable for trial. The court asked Hercules’ counsel if it were at all possible to Skype Beverly Hercules’ testimony because she was a party. Counsel indicated that it was not possible and the court noted that there was no subpoena for the witness.
On appeal, Mitchell specifically argues that he relied on the representations of defense counsel that the Hereuleses would testify live and was “unfairly ambushed” by the' breach of a pretrial agreement. Mitchell also contends that the court’s allowance of the deposition testimony resulted in “severe unfair prejudice to plaintiff,” because of confusion created by the Hereu-leses’ testimonies over the exact tree which fell and the location of its stump. Mitchell argues that the deposition testimony deprived him of an ability to cross-examine the witnesses on this point and allowed opposing counsel to “resurrect the long-abandoned” wrong stump claim in closing arguments, thus prejudicing his case against both the Hereuleses' and DOTD.
La. C.C.P aft. 1450 addresses the use of depositions as follows in relevant part:
A. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then -present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as awitness.
| is(2) The deposition of a party or of anyone who. at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Article 1442 or 1448 to testify on behalf of a public or private corporation, partnership, or association, or governmental agency which is a party may be used by an adverse party for any purpose.
*163 (3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
(a) That the witness is unavailable;
(b) That the witness resides at a distance greater than one hundred miles from the' place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or
(c) Upon application and notice, that such exceptional circumstances' exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.
[[Image here]]
C. Conflicts between this Article and Code of Evidence 804, regarding the use of depositions shall be resolved by the court in its discretion.
Additionally, La. C.E., 804 further defines unavailability as follows in relevant part:
Except as otherwise provided by this Code, a declarant is “unavailable as a witness” when the declarant cannot or will not appear in court to testify for the substance of his statement made outside of court. This includes situations in which the declarant:
[[Image here]]
(5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrong-doing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.
It has been held that the requirements for the admissibility of the deposition of a witness are twofold: (1) the deposition must be admissible launder the Louisiana Code of Evidence and (2) the witness must be either (a) unavailable; (b) residing over 100 miles from the place of trial; or (c) in another state without provocation by the party offering the deposition. Boutte v. ABC Ins. Cos., 00-0649 (La.App. 4th Cir.2/6/02), 811 So.2d 30. A party is not legally “unavailable” as a witness simply because he eschews the trial. Dickens v. Commercial .Union Ins. Co., 99-0698 (La.App. 1st Cir.6/23/00), 762 So.2d 1193. Additionally, a party whose absence from trial is attributable to his choice to be out of state on the date of trial is considered tp have procured hie own absence. Id. A party who is not legally unavailable or who is intentionally absent from trial due to his choice to be out of state may not submit his deposition testimony in lieu of live testimony. Id.
Hearsay evidence may not be considered in the judicial inquiry as to unavailability. Bourgeois v. A.P. Green Indus., Inc., 06-87 (La.App. 5th Cir.7/28/06), 939 So.2d 478, writ denied, 06-2159 (La.12/8/06), 943 So.2d 1095; Wheeler v. New Orleans Public Serv., Inc., 573 So.2d 1237 (La.App. 4th Cir.1991), writ denied, 575 So.2d 826 (La.1991).
The trial court has much discretion in 'determining whether to allow deposition testimony at trial, and its decision will not be overturned unless an abuse of that discretion occurs. Sullivan v. City of Baton Rouge, 14-0964 (La.App. 1st Cir.1/27/15), 170 So.3d 186; see also, Holley Homestead Trust v. Harrison 44,149 (La.App.2d Cir.4/15/09), 11 So.3d 511.
Although Article 1450 does not specify when a witness is “unavailable,” *164 the party asserting the admissibility of a deposition under 12ftArticle 1450 A(3)(a) must show that the witness is unavailable for trial. Sullivan, supra. The determination of whether a witness is unavailable is a preliminary question for the trial court. Sullivan, supra.
Article 1450 of the Code of Civil Procedure and Article 804 of the Code of Evidence apply together. Trascher v. Territo, 11-2093 (La.5/8/12), 89 So.3d 357. In this case, Mrs. Hercules as a party defendant asserted that she was unavailable for trial. Apart from the rules for use of deposition testimony and the Code of Evidence exceptions to the hearsay rule, Mrs. Hercules’ testimony would be inadmissible hearsay, and her confusion in her prior deposition surrounding the location of the stump in question might have been clarified or discounted through her cross-examination at trial. Yet, in the language of Article 804(5), Mrs. Hercules as the proponent of her out-of-court statements asserted that she was unable to procure her attendance by reasonable means. La. C.E. art. 804.
Under the overall circumstances of this case, including Mitchell’s sufficient pretrial raising of this matter, we find that Mrs. Hercules’ deposition testimony should not have been presented in evidence due to her “unavailability.” Her unavailability was not shown. Nevertheless, any error in the introduction of a deposition into evidence in lieu of live testimony, is subject to a harmless error analysis. Bell v. Mid City Printers, Inc., 10-0818 (La.App. 4th Cir.12/22/10), 54 So.3d 1226; Wheeler v. New Orleans Public Serv., supra; Town of Church Point v. Carriere, 463 So.2d 986 (La.App. 3d Cir. 1985); Clark v. Pernie Bailey Drilling Co., 445 So.2d 183 (La.App. 3d Cir.1984); Murray v. Bankers Fire & Marine Ins. Co., 198 So.2d 532 (La.App. 3d Cir.1967).
Again, as discussed above, the best evidence which Mitchell’s expert Patterson reviewed was the photos of the overturned tree and its exposed roots on the morning after the storm. There is no confusion regarding the identity of the tree and its stump and roots from those photos. Patterson’s opinion had to rely heavily upon what was observable regarding the roots of the tree in those pictures. He did not present a convincing view that the diseased condition he observed would have been observable and understood by the Herculeses before the tree fell. Any confusion over the stump in question created by the deposition testimony of Mrs. Hercules and her husband was therefore minimal, and the improper admission of the deposition testimony was harmless error.

Conclusion

For the foregoing reasons, the jury verdict in favor of the defendants is affirmed. Costs of this appeal are assessed to Mitchell.
AFFIRMED.

. Mitchell entered into pretrial settlements with both of these defendants.

. On cross-examination, Patterson was confronted with his previous deposition in which he had stated that the tree had been affected by fusiforme rust that had gone from the stem of the tree up 10-16 feet. Patterson admitted that these statements were made without his review of any photographs of the tree taken at the time it fell and that his conclusion had not been confirmed by any of the photographs.