Judgment rendered March 4, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,263-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

YOLANDA DENISE
WILKERSON

Plaintiff-Appellant

versus

DARDEN DIRECT
DISTRIBUTION, INC. D/B/A
OLIVE GARDEN, AND RANA
MEAL SOLUTIONS, LLC,
LIBERTY MUTUAL INSURANCE
AND ILLINOIS NATIONAL
INSURANCE COMPANY

Defendants-Appellees

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 151689

Honorable Charles Jacobs, Judge

* * * * *

DAVIS LAW FIRM
By: S. P. Davis
     Kharmen Davis

Counsel for Appellant

LUNN IRION LAW FIRM, LLC
By: Gerald M. Johnson, Jr.

Counsel for Appellees,
Darden Direct
Distribution, Inc. d/b/a
Olive Garden, Rana Meal
Solutions, LLC, and
Illinois National
Insurance Company

* * * * *

Before WILLIAMS, MOORE, and GARRETT, JJ.

**GARRETT, J.**

The plaintiff, Yolanda Denise Wilkerson,[1] appeals from a trial court judgment which dismissed, with prejudice, her claims arising out of injuries she allegedly suffered as the result of biting down on a piece of lobster shell in a serving of lobster ravioli at a restaurant. For the reasons expressed below, we reverse the trial court judgment and remand the matter for a new trial.

## FACTS

On December 4, 2015, the plaintiff ate lunch with a friend, Sammy Steadman, at the Olive Garden Restaurant in Bossier City. At some point during the meal, she complained to the restaurant's culinary manager, Ithaca Perkins, that she had found a white or cream-colored foreign object in the lobster ravioli she ordered. On December 21, 2015, she went to the Professional Denture Clinic, where she was seen by a dentist, Dr. Michael Feavel, D.D.S., and a denturist.

On December 2, 2016, the plaintiff filed suit against Darden Direct Distribution, Inc., d/b/a Olive Garden, and its insurer, Liberty Mutual Insurance Company. She also sued Rana Meal Solutions, LLC ("Rana Meal"), the supplier of the lobster ravioli, and its insurer, Illinois National Insurance Company. She alleged that, on December 4, 2015, while dining at the Bossier City Olive Garden Restaurant, she was served a defective lobster ravioli meal which contained a large lobster shell. She asserted that, as a result of biting down on the shell, she broke a tooth and cut her gum. She further contended that the incident was observed by and reported to the

---

[1] The plaintiff testified at trial that, due to divorce, her last name was now Smith.

restaurant's employees, who observed her injury and drafted a report. The plaintiff alleged that all the defendants were negligent in failing to properly inspect and process the lobster ravioli.

The plaintiff propounded interrogatories and requests for production of documents to the defendants. Interrogatory No. 8 made the following inquiry:

> Please state in detail whether any of your employees were made aware of the incident and injury to plaintiff's teeth, gum and mouth on December 4, 2015. Then state whether an incident report was generated.

Additionally, Request for Production No. 6 stated: "Please produce a copy of the incident report." While the interrogatories and the requests for production are included in the appellate record, the defendants' responses are not.

In January 2017, a general denial answer was filed in which (1) GMRI, Inc., d/b/a Olive Garden ("GMRI"), asserted that it was incorrectly called Darden Direct Distribution, Inc., in the petition, and (2) Liberty Mutual alleged that it was not an insurer for GMRI for any amounts less than $500,000. They also asserted comparative fault and assumption of the risk. In February 2017, the plaintiff voluntarily dismissed her claims against Liberty Mutual without prejudice at defendant's cost, while reserving her rights against all other parties.

In February 2017, Rana Meal, GMRI, and Illinois National Insurance Company filed an answer in which they asserted that the plaintiff's injuries were caused solely and exclusively by her own negligence. They alleged comparative fault and failure to mitigate damages.

A bench trial was set for April 23, 2018. By joint motions to continue, it was reset, first to July 11, 2018, then to September 11, 2018, in order to complete additional discovery.

When court convened on September 11, 2018, the parties extensively discussed the availability of several witnesses. Plaintiff's counsel told the court that the sheriff's office had failed to timely serve his subpoenas on Dr. Feavel, the plaintiff's treating dentist, and John Dudley, who was described as the owner of the facility where the plaintiff was treated.[2] Apparently, the defendants' subpoena had not been served on Dr. Feavel either. Defense counsel informed the court that he was willing to allow the plaintiff to use Dr. Feavel's discovery deposition, which was taken in September 2017, but that the plaintiff insisted on his live testimony. Defense counsel further told the court that John Dudley, who had only prepared the plaintiff's dentures, had thus far refused to give a deposition and, consequently, had not been subpoenaed by the defense. Additionally, defense counsel objected to the plaintiff presenting the testimony of Mr. Steadman, the plaintiff's dining companion. Defense counsel asserted that he had twice tried unsuccessfully to subpoena Mr. Steadman for a deposition. Plaintiff's counsel stated that he had only talked to Mr. Steadman for the first time the day before trial.

Finding that the plaintiff was entitled to have her treating dentist testify, the trial court ruled that it would take testimony from two of the witnesses who were present and then recess the trial to allow Dr. Feavel and Mr. Dudley to be subpoenaed at least 30 days prior to the resumption of

---

[2] The record indicates that there are two Dudleys associated with the Professional Denture Clinic – John Dudley and William Dudley.

trial. The trial court also instructed plaintiff's counsel that, if he wished to present Mr. Steadman's testimony, it was his responsibility to make him available for a discovery deposition. Mr. Steadman, who was present in court, was placed under the rule of sequestration in anticipation of his future testimony.

Ms. Perkins was the first witness called by the plaintiff. She testified that she was the highest ranking managerial person at the restaurant on December 4, 2015. A service professional, Suzie Smith, advised her that the plaintiff had an issue with her ravioli. When Ms. Perkins spoke to the plaintiff, she and a male companion were seated at the bar. The plaintiff told her that there was a lobster shell or bone fragment in her ravioli and that she had cut her tooth on it. The piece of ravioli was displayed to Ms. Perkins in a napkin held by Suzie.[3] Because it had been chewed, Ms. Perkins could see inside the ravioli; she did not observe any bone fragments, shell, or blood. She collected information from the plaintiff for an incident report, which she later sent to the restaurant's legal group, and comped the plaintiff's meal. She testified that the plaintiff did not appear to be having any issues and denied giving the plaintiff a contact number. Ms. Perkins further testified that she had never encountered any other complaints of foreign objects in the lobster ravioli.

Plaintiff's counsel objected to and sought to exclude Ms. Perkins's testimony about an incident report on the basis that he had been advised during discovery that there was no such report. Defense counsel stated that

---

[3] Ms. Perkins testified that, while she was speaking with the plaintiff and doing an incident report, Suzie (who was unaware that she should keep it) threw away the napkin and its contents.

4

it was his understanding that there were no paper incident reports and that all such reports were submitted electronically. He produced a copy of a document he described as a computer printout of information that the manager would have supplied when reporting the matter to corporate and stated that he believed that it was produced to the plaintiff during discovery. Plaintiff's counsel declined to look at the document. The trial court overruled the plaintiff's objection to Ms. Perkins's testimony mentioning the incident report, as well as her motion to totally exclude Ms. Perkins's trial testimony.

The plaintiff's testimony concerning the incident differed from that of Ms. Perkins. She testified that, when she bit into a piece of ravioli, a white and cream-colored piece of shell or bone stuck her in the right upper gum and cracked or chipped a right upper tooth. She said she "screamed a little" and "caught" her mouth. She then spit the bone out on her plate, where it remained, and there was blood mixed in the food she spat out. The plaintiff said that when Ms. Perkins came to the table, she got a fork, picked around, and saw the bone. According to the plaintiff, Ms. Perkins told her it was the fault of the packing company, not the restaurant, and she was very sorry. Ms. Perkins took the plate to the back and then returned. The plaintiff testified that she was in obvious pain, but Ms. Perkins did not offer her medical treatment. She assessed her pain as 10 out of 10. She said Ms. Perkins gave her a phone number for Olive Garden's headquarters; the plaintiff said she called the number, and someone (whose name she could not recall) called her back and settled her claim.

The plaintiff testified that she did not immediately seek medical help because of her fear of dentists. She admitted that she was not a regular

dental patient and that she could not recall the last time she had gone to a dentist since 2010. However, she maintained that she had no issues with her teeth and gums and that she had no chipped teeth prior to her Olive Garden mishap. She testified that, at the time of the alleged incident, she had had front upper dentures for about 16 to 17 years. She stated that on December 21, 2015, she went to the Professional Denture Clinic because her gums were pussy and infected. She stated that she gave them a history about the Olive Garden incident and that she was given antibiotics and pain medications. The plaintiff testified that, as part of her treatment, six upper teeth were extracted, her preexisting denture was removed, and a new temporary upper denture was implanted. However, she has not been back to get the permanent upper denture. She further testified that none of her lower teeth were pulled. When the trial court queried why the denture clinic's treatment plan referred to a "lower combination partial," she said that it was a mistake. At the conclusion of her testimony, the case was recessed until November 19, 2018. Plaintiff's counsel agreed with defense counsel's suggestion about trying to arrange a trial deposition for Dr. Feavel.

To that end, on September 27, 2018, plaintiff's counsel sent a letter to the Professional Denture Clinic on Pines Road in Shreveport which was addressed to both Dr. Feavel and "Mr. Bill Dudley." It informed them that the trial had been continued to November 19, 2018, for their trial testimony and offered to arrange to take their trial depositions in lieu of them having to testify at trial.[4] The record also contains the sheriff's returns showing

---

[4] The letter in its entirety read as follows:

> Mrs. Yolanda Wilkerson's trial began on September 11, 2018. The trial was continued to November 19, 2018 for both your trial testimony. I am writing to accommodate your busy schedules. I called your office on

personal service on November 2, 2018, of a summons on "Bill" Dudley and a summons and a subpoena duces tecum on Dr. Feavel.

When court reconvened on November 19, 2018, plaintiff's counsel informed the judge that, although subpoenaed, neither Dr. Feavel nor Mr. Dudley were present. The trial court instructed counsel to phone the witnesses. It then took up another case in order to give them additional time to arrive. When the matter was finally taken up, the trial judge placed on the record the following information which it had already shared with counsel during a pretrial conference: Both subpoenas had been served at the Professional Denture Clinic. The trial judge stated that he had called the phone number for the clinic and talked to a person who identified himself as John Dudley. This person informed him that William R. Dudley, who the judge assumed was "Bill Dudley," had been retired for "five, going on six years," and Dr. Feavel had not worked there for "two, going on three years."[5] John Dudley also said that the subpoena had been left at the facility's front desk. The trial judge further stated that he then searched for Dr. Feavel on the Internet and discovered a different address and phone number for him.

During a lengthy discussion on the record, plaintiff's counsel stated that he understood that both Bill Dudley and Dr. Feavel still worked at the

---

Monday and left a message to accommodate your schedules by taking a trial deposition at your office, so you will not have to appear in court. I need for you to let me know by October 5, 2018 whether you will allow us to take your trial deposition which will prevent us from subpoenaing you to testify on November 19, 2018. If you are willing to submit to trial depositions at your office let me know your available dates also. Please contact me should you have any questions. I await your response.

[5] We note that this assertion directly contradicts the information in Dr. Feavel's discovery deposition, which had been taken by the defendants approximately 14 months before in September 2017. Dr. Feavel testified at that time that he was an independent contractor with the Professional Denture Clinic on Pines Road.

7

denture clinic. He informed the court that, a week after he sent his September 27, 2018 letter to the clinic address, Dr. Feavel called him from the clinic number and told him he would get back with him with potential deposition dates for him and "Mr. Dudley." However, he did not hear back from Dr. Feavel, and he twice tried unsuccessfully to contact him. Plaintiff's counsel further recounted talking to a receptionist at the denture clinic, who also told him that they would get back to him. He was never told that the letter recipients no longer worked at the clinic. He informed the court that he expected "John Bill Dudley" or "Bill Dudley" to be present in court and that this man had told him that the plaintiff's broken tooth had ruptured her skin and caused an infection, which led to the clinic's treatment plan for her.[6] He stated that this conversation took place after Dr. Feavel's deposition and, consequently, Dr. Feavel had not been asked questions about it. He further stated that he told defense counsel about the situation, but they were unsuccessful in getting "Mr. Dudley" to submit to a deposition. He introduced into evidence his letter and the subpoena returns.

After additional discussion, the trial court denied the plaintiff's request for a continuance. It found that the "Bill Dudley" subpoena had not

---

[6] Plaintiff's counsel recounted:

> I know he created this treatment plan. I talked to him about the treatment plan. I said, why is the treatment plan at that price? He told me because of the fact that Ms. Wilkerson had a pre-existing denture when she bit down on this bone at – at Olive Garden it broke her tooth, it – it ruptured her – her skin, caused an infection. And because the infection was so widespread they had to remove the pre-existing denture in order to put the new –.
> . . .
> Because of the fact when I talked to Mr. Dudley after Mr. - - after Dr. Feavel's deposition Mr. Dudley explained to me that the infection's what caused the problem. Then I had a subsequent conversation with Dr. Feavel and I told him Dr. - - Mr. Dudley told me that this was the cause of his plan. Dr. Feavel at that time agreed and said, yes, that is correct.

been properly issued because "you have to have a full name and a correct address."  The trial court stated that, if the intended recipient was "William R. Dudley," "it took me approximately five minutes to find out that he's not at that address."  Additionally, over the plaintiff's objections, the court allowed the defendants to admit Dr. Feavel's discovery deposition into evidence pursuant to La. C.C.P. art. 1450(A)(5), which permits an expert's deposition to be used "notwithstanding the objection of counsel to the use of that deposition, if the court finds that, under the circumstances, justice so requires."  The trial court reasoned that the subpoena for Dr. Feavel also appeared not to have been properly served.  The trial court chastised plaintiff's counsel for not resorting to an Internet search – as it had – to find Dr. Feavel's "correct" phone number when he did not hear back from the dentist.  The trial court declared that it "took me approximately thirty seconds to find out his correct address" on the Internet.  The court discounted the plaintiff counsel's explanation that he had been told that both men still worked at the clinic, declaring that "I had a conversation this morning with a John Dudley who gave me all of this information within five minutes.  And how you got a totally different story I don't understand but something is not right here."  The medical records and treatment plan for the plaintiff from the denture clinic were also admitted into evidence, as was Mr. Steadman's deposition.

In his deposition, Mr. Steadman generally corroborated the plaintiff's account of the Olive Garden incident and contradicted portions of the manager's version.  He testified that, while they were eating, the plaintiff suddenly made a noise and "caught her mouth."  She removed something "off white" from her mouth and put it on the side of her plate.  He described

9

it as looking "like some type of bone." While he did not recall seeing any blood, he conceded that he could not say the plaintiff was lying if she had testified that there had been bleeding. The manager came out, talked to the plaintiff, and wrote down some information on paper. The manager also removed the object, but Mr. Steadman did not know what she did with it. After the manager spoke to the plaintiff, they left the restaurant and he took the plaintiff home.

Dr. Feavel testified in his deposition that he first saw the plaintiff on December 21, 2015, when she came in to have her teeth cleaned and that a treatment plan was done at that time. He opined that she knew she needed a denture. He did a gross debridement. He described her hygiene habits as the "upper level of poor." She had a broken lower tooth, but the records indicated no treatment was provided for it. He stated it was not badly broken and she did not complain of pain when he examined her. Dr. Feavel testified that the plaintiff did not tell him about the Olive Garden incident. Dr. Feavel initially opined that none of the treatment provided by his clinic was caused by the plaintiff biting down on something. Instead it was related to a lack of dental hygiene and a lack of adequate past dental treatment. In August 2016, he extracted six upper teeth and put in stitches in the upper right area near a wisdom tooth. He put in her temporary or healer denture. However, she had not scheduled coming back for the permanent denture.

During his deposition, Dr. Feavel was questioned about a "to-whom-it-may-concern" letter, which was found in the plaintiff's clinic records. Although it was not introduced into evidence, it was read to Dr. Feavel as follows:

> Whom it may concern, Ms. Yolanda Wilkerson was seen in our office on December 21, 2015. Patient states she had an incident at Olive Garden. When we saw her for her gross debridement, deep cleaning, Ms. Wilkerson was found irritated and tooth number twenty-nine was broken.[7]

Dr. Feavel opined that the letter and the treatment plan were written by John Dudley. He stated that obviously John or William Dudley had talked to the plaintiff and obtained this information. Based on the history she gave of biting down on the ravioli and the fact that tooth #29 was broken, Dr. Feavel concluded that it was more probable than not that the ravioli caused her tooth to break and made her gum bleed.

In his deposition, Dr. Feavel testified that the one of the Dudleys, who were second-generation denturists and "premium people in their field," formulated the plaintiff's treatment plan and that he reviewed it. According to him, the Dudleys prepared the plan based on his observations and recommendations and that "[w]e always cross reference."

On February 11, 2019, the trial court issued a written opinion in which it ruled against the plaintiff. It found that she failed to carry her burden of proving that the incident ever occurred, holding that the only evidence in her favor was her own "self-serving testimony." The court summarized the testimony of the other witnesses as follows. The treating dentist, Dr. Feavel, testified that the plaintiff became his patient shortly after the alleged incident but she never related that incident to him. Dr. Feavel also testified that she needed dentures due to long-term poor dental hygiene, not trauma. The Olive Garden manager stated that, while the plaintiff complained of biting down on an alleged piece of lobster shell, she was unable to produce it. The

---

[7] According to the plaintiff's dental records, Tooth #29 is a lower tooth. In her testimony, the plaintiff indicated that she injured a right upper tooth.

11

plaintiff's dining companion, Mr. Steadman, stated that the plaintiff made a noise while eating and then produced a small white object from her mouth. He did not know the nature of the object or observe any sign (such as blood) of a trauma to the plaintiff. She did not complain to him of any injury to her teeth or seek immediate medical treatment. Instead he drove her home after the meal. The trial court concluded that the plaintiff's testimony was "simply not credible, especially in light of the fact that despite claiming damage to an upper front tooth she presented dental records concerning the replacement of her bottom teeth only."[8] Judgment dismissing the plaintiff's claims, with prejudice and at her cost, was signed on March 7, 2019.

The plaintiff appealed. Although the plaintiff has urged several assignments of error, we find that the trial court erred in denying the plaintiff's motion for continuance under all the circumstances presented here.

## MOTION FOR CONTINUANCE

### *Law*

A continuance may be granted in any case if there is good ground therefor. La. C.C.P. art. 1601. A continuance shall be granted if at the time a case is to be tried, the party applying for the continuance shows that he has been unable, with the exercise of due diligence, to obtain evidence material to his case; or that a material witness has absented himself without the contrivance of the party applying for the continuance. La. C.C.P. art. 1602.

---

[8] This statement is incorrect. The plaintiff's records from the denture clinic primarily concern the extractions of upper teeth, which were related to the upper denture. The "treatment plan," a document detailing the proposed treatment and providing a cost breakdown, included two apparently erroneous references to lower denture work. However, it also referred to the extraction of the upper teeth for the upper denture.

"Good" ground is something less than "peremptory" ground, for which La. C.C.P. art. 1602 declares a continuance "shall" be granted. Inability to obtain evidence that is material despite "due diligence" is a peremptory ground under La. C.C.P. art. 1602. Inability to obtain material evidence despite diligence that is not quite "due diligence" may therefore be a "good," though not a peremptory, ground. *Sands v. State Through La. State Med. Ctr., Sch. of Dentistry*, 458 So. 2d 960 (La. App. 4 Cir. 1984), *writ denied*, 460 So. 2d 1044 (La. 1984).

It is a well-established rule that the trial judge has wide discretion in acting upon a motion for continuance. The ruling will not be disturbed on appeal in the absence of a clear showing of abuse of that discretion. *Sauce v. Bussell*, 298 So. 2d 832 (La. 1974); *Howard v. Lee*, 50,366 (La. App. 2 Cir. 1/13/16), 185 So. 3d 144. An abuse of discretion occurs when such discretion is exercised in a way that deprives a litigant of his day in court. *Howard v. Lee*, *supra*.

While recognizing the much discretion vested in a trial judge in the matter of granting or refusing continuances, it has never been held that such discretion is absolute or that it may be exercised arbitrarily. Appellate courts are vested with the right and duty to correct such errors by the trial judge in matters of this kind. However, it should be pointed out that appellate courts only interfere in such matters with reluctance and in what are considered extreme cases. *Sauce v. Bussell*, *supra*; *Howard v. Lee*, *supra*

The trial court must consider the particular facts in each case in deciding whether to grant or deny a discretionary continuance. Some factors to consider are diligence, good faith, and reasonable grounds. *Tarbutton v. Tarbutton*, 52,102 (La. App. 2 Cir. 6/27/18), 251 So. 3d 590; *Connor v.*

13

*Scroggs*, 35,521 (La. App. 2 Cir. 6/12/02), 821 So. 2d 542. Equally important is the defendant's corollary right to have his case heard as soon as is practicable. The trial court may also weigh the condition of the court docket, fairness to both parties and other litigants before the court, and the need for orderly and prompt administration of justice. *Tarbutton v. Tarbutton*, *supra*; *Howard v. Lee*, *supra*; *Connor v. Scroggs*, *supra*.

### *Discussion*

When plaintiff's counsel was unsuccessful in arranging for trial depositions of the two witnesses, he had them subpoenaed. The subpoenas were served at the denture clinic because plaintiff's counsel was under the impression that both witnesses worked there. This belief was supported by one of the prospective witnesses, Dr. Feavel, contacting him a week after he sent the September 27, 2018 letter to the denture clinic and by a conversation with the clinic receptionist. Both of these incidents tend to counter the statements made to the trial judge that the witnesses had been gone from the clinic for many years. Consequently, we are unable to say that plaintiff's counsel was unreasonable in relying upon the service returns indicating that the sheriff had properly served the summonses upon these witnesses at the denture clinic. Certainly his reliance was just as reasonable as the trial judge's independent Internet searches and telephone conversation with someone purporting to be one of the denturists at the clinic.[9] Plaintiff's counsel was not required to follow the trial court's example in conducting Internet searches when he reasonably believed that the address utilized for

---

[9] We note that the judge repeatedly stated that he did not know why John Dudley would lie to him and that "I have to take John Dudley at his word." The implication from these statements was that he did not have to take plaintiff's counsel, an officer of the court, at his word.

14

service was valid and the sheriff's returns showed that personal service had been made on both witnesses.

While the trial judge has wide discretion in acting upon a motion for continuance, an abuse of discretion occurs when such discretion is exercised in a way that deprives a litigant of her day in court. Under the facts of this case, we find that the trial court abused its discretion in denying the plaintiff's motion for continuance. It placed undue weight on the right of the defendants to have the case heard as soon as possible and gave little or no consideration of the plaintiff's good faith and reasonable belief in the sheriff's service of the subpoenas. Furthermore, there was no showing that the defendants would have been prejudiced by the granting of the continuance. The plaintiff, whose credibility was put at issue by the defendants, was deprived of the opportunity to present evidence which may have bolstered her credibility. Under the circumstances presented here, the plaintiff was prejudiced by not being allowed to present her case.

Based on the foregoing, we reverse the trial court judgment and remand the matter for a new trial.[10]

## INCIDENT REPORT

The plaintiff also argues that the trial court erred in denying her motion to exclude the testimony of Ms. Perkins, in whole or in part, on the basis of the defendants' failure to produce in discovery the incident report authored by Ms. Perkins.

---

[10] Reversing the trial court judgment and ordering a new trial should also resolve the issue of whether Dr. Feavel's discovery deposition was properly admitted, over the plaintiff's objections, under La. C.C.P. art. 1450(A)(3) and (5) and La. C.E. art. 804(A). *See Mitchell v. State, Dep't of Transp. & Dev.*, 50,432 (La. App. 2 Cir. 3/23/16), 193 So. 3d 152, *writ granted*, 16-1097 (La. 10/12/16), 207 So. 3d 1061, *order recalled*, 16-1097 (La. 1/25/17), 219 So. 3d 1061, and *writ denied*, 16-1097 (La. 1/25/17), 219 So. 3d 1061.

15

At trial, Ms. Perkins testified that she filled out an incident report about the plaintiff's complaint. Plaintiff's counsel objected to this testimony on the basis that he had been told during discovery that no such document existed. The trial court responded by inquiring if plaintiff's counsel had taken the witness's deposition.

> MR. DAVIS [plaintiff's counsel]: Judge, I didn't make - - take her deposition, but I have a right to explore my discovery, Judge. You know that. I asked for the incident report, Judge. I was told in discovery that one - - didn't one exist.

> THE COURT: Well.

> MR. DAVIS: Had I gotten one, then, yes, I may would've taken her deposition. But I'm entitled to know that, Judge.

> THE COURT: Mr. Johnson - -

> MR. DAVIS: I'm entitled to've had a copy of that incident report.

> THE COURT: - - if he - - if he didn't have it in his possession or didn't know it was taken, I'm gonna overrule your objection. You may continue. These - - that's a - - that's a pre-trial discovery matter.

> MR. JOHNSON [defense counsel]: Your honor, for the record it's my understanding that there are no paper incident reports, that this is all submitted electronically and – and goes into a computer system and - and that's how it works.

> MR. DAVIS: Judge, that's not what she just testified to, Judge. She testified she did a paper report and she attached a ticket to it. I requested that in my pre-trial discovery. If I'm told by an attorney, Judge, it doesn't exist, I'm supposed to take that and believe that so it – so it didn't exist.

> THE COURT: Mr. Davis, this is a pre-trial discovery matter. Okay. This incident happened back in December of 2015. How you choose to conduct your discovery is your business, but, you know, this was an issue then the issue that you've raised is something that should've been raised pre-trial after, you know, you had taken the deposition of the restaurant manager.

> MR. DAVIS: Judge, I never took it.

THE COURT:  So I'm - - I'm overrule - - I made my ruling.  I'll note your objection to my ruling.  But we need to move on.

**(OBJECTION NOTED FOR THE RECORD)**

MR. DAVIS:  Judge, I want to make another motion.  I'm strenuously objecting to the court's ruling and I'm moving that - that Ms. Ithaca Perkins' testimony be excluded from this trial period because of the fact that I was led to believe and told in discovery that I requested an incident report and I was told one did not exist.  So I'm moving to exclude her testimony in this trial at this time.

THE COURT:  That is denied.

MR. DAVIS:  Okay.  And let the record reflect that I object to the court's ruling.

MR. JOHNSON:  Your Honor, I do have a copy of, I think what is a computer printout of the information that Ms. Perkins would have supplied in connection with her reporting of the incident.  I think this was produced in discovery and I'll show it to Mr. Davis and would ask if, you know, if you've ever seen that before.  If not - -

MR. DAVIS:  Judge, it's untimely.

MR. JOHNSON:  - - in any - -

MR. DAVIS:  It's untimely.

MR. JOHNSON:  In any event, you – you're free to ask her questions about it.

MR. DAVIS:  And I don't want to see it at this point, Judge.

MR. SHERIFF:  One at a time.

MR. JOHNSON:  But – but what I'm saying, Your Honor, is that I believe that was produced in discovery.  It's simply a computer printout of data, basic personal information about Ms. Wilkerson when – when the witness is called upon to submit to the powers that be information about a claim she takes down basic information about where the person lives, what their contact information is, and I was gonna - - I'll bring this out in – in my examination of her, but I offer that document to Mr. Davis.  I think it was produced in discovery and – and he's welcome to question Ms. – Ms. Perkins on it today.

THE COURT:  Fair enough.  But again, all this what we're arguing about here is something that was easily discoverable in a

pre-trial discovery deposition of a witness who you called first Mr. Davis. I don't understand why, you know, I can't tell you how to practice law, but I don't understand why you called a witness first that you never deposed.

MR. DAVIS: Judge, I have a right to try my case.

THE COURT: And if - - and if you had deposed her this issue could've been solved. That's why - - that's why I've denied your motions. So we need to move on.

In her testimony, Ms. Perkins not only admitted doing an incident report, but she also stated that it included a copy of the ticket, thus indicating that there was, in fact, a paper incident report. Without contradiction, plaintiff's counsel repeatedly stated on the record that, in response to his discovery requests, he had been informed by the defendants that no such report existed. Defense counsel responded by offering a computer-generated printout that he thought had been produced in discovery. The trial court never questioned defense counsel about his failure to produce the actual incident report, pursuant to the plaintiff's discovery requests. Instead, the trial court chose to repeatedly and dismissively criticize plaintiff's counsel for failing to depose Ms. Perkins, an action plaintiff's counsel was not required to do. In so doing, the trial court unfairly attempted to place the responsibility – and the blame – for the defendants' discovery failure on the plaintiff's counsel, who was entitled to rely upon the veracity of the defendants' discovery responses.

At oral argument, defense counsel was questioned by the panel about the existence of a written incident report. He stated that, based upon Ms. Perkins's testimony, he thought there was a paper report, which he referred to as an "interim document," but he did not know what happened to it. He insisted that the data in the incident report and the computer printout were

the same.  He stated that he could not recall how he responded to the plaintiff's discovery request for the incident report; however, he believed that the computer printout was handed over to the plaintiff.[11]

While questioning Ms. Perkins at trial, defense counsel elicited a declaration from her that there was no information in the incident report that she had not described in her testimony.  Because the record contains neither the incident report nor the computer printout, we are unable to judge the veracity of this statement.  At any rate, it goes without saying that plaintiff was entitled to the incident report pursuant to her discovery request and that, on remand, the defendants should make every effort to produce it or provide a definitive answer as to what became of this document.

This discovery issue, combined with the trial court's failure to grant the plaintiff's motion for continuance, compels this court to reverse the trial court judgment and remand the matter for a new trial.  As a result, we pretermit the plaintiff's final assignment of error pertaining to whether the trial court was manifestly erroneous in its judgment dismissing the plaintiff's case.

### CONCLUSION

The trial court judgment dismissing the plaintiff's claims is reversed. The matter is remanded to the trial court for a new trial.  Costs of this appeal are assessed to the defendants.

**REVERSED AND REMANDED.**

---

[11] During oral argument, plaintiff's counsel stated that the discovery response received from the defendants indicated that no written report was done.